# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **FRIENDS OF ANIMALS**, | Case No. 2:16-cv-1670-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **BUREAU OF LAND MANAGEMENT**, | |
| Defendants. | |

Michael Ray Harris, FRIENDS OF ANIMALS, 7500 Arapahoe Road, Suite 385, Centennial, CO 80112; R. Scott Jerger, FIELD JERGER LLP, 621 SW Morrison Street, Suite 1225, Portland, OR 97205. Of Attorneys for Plaintiffs.

Lucinda J. Bach, UNITED STATES DEPARTMENT OF JUSTICE, 601 D Street NW, Washington, DC 20004. Of Attorney for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff Friends of Animals ("FOA") sues the United States Bureau of Land Management ("BLM") alleging that BLM's actions in gathering and removing horses from the Three Fingers Herd Management Area ("HMA") in response to a fire in August 2016 violated the National Environmental Policy Act ("NEPA") and the Wild Free-Roaming Horses and Burros Act ("WHBA"). Before the Court are the parties' cross-motions for summary judgment (ECF 50, 55) and BLM's motion to strike several exhibits submitted by FOA and to defer

briefing on the issue of remedy in the event this Court finds in favor of FOA. For the reasons discussed, each party's motion for summary judgment is granted in part and denied in part, and BLM's motion to strike is granted.

## STANDARDS

### A. Standard of Review under the APA

The Administrative Procedure Act ("APA") provides for judicial review of final agency action. 5 U.S.C. §§ 701-706. Under the APA, a court may set aside agency actions only if such actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Further, an "agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. Although a court's "inquiry must be thorough, the standard of review is highly deferential; the agency's decision is 'entitled to a presumption of regularity,' and [a court] may not substitute [its] judgment for that of the agency." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).

### B. Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

When parties file cross-motions for summary judgment, the court "evaluate[s] each motion separately, giving the non-moving party in each instance the benefit of all reasonable inferences." *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) (quotation marks and citation omitted); *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 674 (9th Cir. 2010) ("Cross-motions for summary judgment are evaluated separately under [the] same standard."). In evaluating the motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Thereafter, the non-moving party bears the burden of designating "specific facts demonstrating the existence of genuine issues for trial." *Id.* "This burden is not a light one." *Id.* The Supreme Court has directed that in such a situation, the non-moving party must do more than raise a "metaphysical doubt" as to the material facts at issue. *Matsushita*, 475 U.S. at 586.

# LEGAL BACKGROUND

## A.  National Environmental Policy Act ("NEPA")

NEPA requires that a federal agency "consider every significant aspect of the environmental impact of a proposed action and inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002)) (alterations omitted).  NEPA's procedural requirements "force agencies to take a 'hard look' at the environmental consequences of their actions. *Id.* (quoting *Kern*, 284 F.3d at 1066). NEPA also established the Council on Environmental Quality ("CEQ"). "Regulations governing how NEPA is implemented have been promulgated by the Council of Environmental Quality, at 40 C.F.R. §§ 1505.1–1508.28." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011).

Among NEPA's procedural requirements is a requirement that agencies considering "major Federal actions significantly affecting the quality of the human environment" prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(C); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486-87 (9th Cir. 2011). The purpose of an EIS is primarily "to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1. The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

To determine whether an EIS is necessary, an agency may first prepare an Environmental Assessment ("EA").[1] An EA serves to: (1) "Briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact"; (2) "[a]id an agency's compliance with [NEPA] when no [EIS] is necessary"; and (3) "[f]acilitate preparation of a statement when one is necessary." 40 C.F.R. § 1508.9. An EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9. If, based on an EA, an agency determines that the contemplated federal action will not significantly affect the environment, "the federal agency may issue a finding of no significant impact ('FONSI') in lieu of preparing an EIS." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010) (quoting *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005)). If the agency does not make a FONSI, an EIS is required. Where an agency does not "prepare an EIS, it must supply a convincing statement of reasons to explain why a project's impacts are insignificant." *Tidwell*, 599 F.3d at 937. This statement is "crucial to determining whether the agency took a hard look at the potential environmental impact of a project." *Id.*

Whether a federal agency prepares either an EIS or an EA, NEPA mandates that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E); *Native Ecosystems Council*, 428 F.3d at 1245 ("The alternatives provision of NEPA applies whether an agency is preparing an EIS or an EA.").

---

[1] If an agency expects that an action would significantly affect the environment, an agency may directly issue an EIS without completing an EA.

**B. Wild Free-Roaming and Burros Act ("WHBA")**

The Wild Free-Roaming Horses and Burros Act ("WHBA"), 16 U.S.C. §§ 1331 *et seq.*, governs the management and treatment of wild horses and burros across the nation. Concerned that wild horses and burros were "fast disappearing from the American scene," Congress enacted WHBA to protect the "wild free-roaming horses and burros [that] are living symbols of the historic and pioneer spirit of the West." 16 U.S.C. § 1331. WHBA requires that wild horses and burros "be considered . . . an integral part of the natural system of the public lands" in places where they were found at the time of WHBA's passage. *Id.* Congress enacted WHBA to provide that these animals "be protected from capture, branding, harassment, [and] death." *Id.*

WHBA directs that the Secretary of the Interior—through BLM—"manage wild free-roaming horses and burros" "as components of the public lands" and "in a manner that is designed to achieve and maintain a thriving natural ecological balance [("TNEB")] on the public lands." 16 U.S.C. § 1333(a); 16 U.S.C. § 1332(a) (defining "Secretary"). To accomplish this, BLM establishes Herd Management Areas ("HMAs") "for the long-term maintenance of [wild horse and burro] herds." United States Department of Interior, Bureau of Land Management, Wild Horses and Burros Management Handbook ("WHBA Handbook") at § 1. BLM also establishes an Appropriate Management Level ("AML") for each HMA, which sets the "optimal population range[]" of horses that can live on the HMA while maintaining a TNEB. *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 209 (D.D.C. 2015); 16 U.S.C. § 1333(b)(1). BLM may consider various site-specific factors such as the availability of forage, water, cover, and space—the necessities of a wild horse habitat—to calculate the AML. WHBA Handbook at §§ 3.1-3.3, 4.2.2.2.

WHBA directs BLM to maintain an inventory of wild free-roaming horses and burros on public lands, which is used to determine whether AML levels are appropriate, whether an

"overpopulation" exists in any area, and whether any action should be taken to remove excess animals or to maintain AML levels. 16 U.S.C. § 1333(b)(1). When the Secretary determines "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). BLM is afforded wide discretion in managing public lands and effectuating management action. 16 U.S.C. § 1333(b)(1); *United States v. Mead Corp.*, 533 U.S. 218, 220 (2001) (noting that agencies benefit from "specialized experience and broader investigations and information") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (2001)); *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) (an environmental impact statement "requires a high level of technical expertise and is properly left to the informed discretion of the responsible federal agencies"); *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1065 n. 16 (9th Cir. 2014) (noting BLM's wide discretion in protecting, managing, and controlling horses and burros on public lands); *Am. Horse Prot. Ass'n v. Watt,* 694 F.2d 1310, 1318 (D.C. Cir. 1982) (1978 amendments to WHBA indicate congressional intent to insulate BLM management decisions from intensive judicial review and institute a deferential standard).

Courts defer to BLM's expertise in making excess and action determinations. *In Def. of Animals*, 751 F.3d at 1066 (finding that agency expertise deserves deference as to when an overpopulation exists and action is warranted); *see also Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346, 1356 (9th Cir. 1994) (the standard of review of land management actions is "decidedly deferential to the agency's expertise").

## FACTUAL BACKGROUND

This dispute concerns wild horses in the Three Fingers HMA, which spans 62,508 acres in Malheur County, Oregon. AR 3F-0599. The Three Fingers HMA is divided into two

pastures—the Wildhorse Basin Pasture in the north and the Riverside Pasture, which includes the

Shadscale Flat area, in the south. AR 3F-0604. The AML for wild horses in the Three Fingers

HMA, established in 1975, is between 75 and 150. AR 3F-0599.

## A. The 2011 Environmental Assessment

In May 2011, BLM, operating through the Malheur Field Office, determined that excess

wild horses were present within and outside the boundaries of the Three Fingers HMA, and

proposed to gather and remove excess horses to "ensure that wild horses in the HMA are

managed in conjunction with other resource values and uses to provide for a thriving natural

ecological balance." AR 3F-0592. BLM prepared an Environmental Assessment ("2011 EA") to

analyze the environmental impacts associated with the proposed gather and removal.

AR 3F-0599-0645. BLM reported in the 2011 EA that approximately 255 wild horses resided

within the Three Fingers HMA—105 horses above the maximum limit of the AML.

AR 3F-0599. BLM also found that the horses were using more than the amount of forage

allocated for their use by between 25 and 30 percent. AR 3F-0599. BLM reported "heavy to

severe utilization of riparian and upland vegetation in and adjacent to perennial streams, springs,

and reservoirs." AR 3F-0599. According to BLM, horse overpopulation caused areas of the

HMA to experience resource damage, which was likely to continue if action was not taken.

AR 3F-0599. BLM concluded that it needed to act to protect the land from deterioration and to

meet the established objectives and goals of the 2002 Southeastern Oregon Resource

Management Plan ("SEORMP"), which set the AML for Three Fingers HMA and provides

guidance on management of the HMA. AR 3F-0599.

To return the number of horses to within the AML range for the Three Fingers HMA,

the 2011 EA proposed five alternative courses of action, including taking no action.

AR 3F-0602. BLM adopted the fourth alternative. AR 3F-0592. This involved gathering 250

wild horses and transporting 175 of those horses to the Burns Wild Horse Corrals, from where they would be put into an adoption program or sent to a sanctuary. The remaining 75 horses would be gathered, sorted, and returned to the HMA. AR 3F-0592. BLM would adjust the sex ratio of the returned horses to slow population growth. AR 3F-0592. BLM released a preliminary version of the 2011 EA for public comment. AR 3F-0593-94. BLM received over four thousand responsive comments, which it reviewed and considered when finalizing the EA. AR 3F-0641-44.

BLM determined, based on the 2011 EA, that the proposed gather would not have a significant impact on the environment, and issued a FONSI. AR 3F-0596. The 2011 EA predicted that in the 10-20 years following the 2011 EA, gathers to remove excess wild horses were reasonably foreseeable at approximately four-year intervals. AR 3F-0619. It noted that "[a]ny future wild horse management would be analyzed in appropriate environmental documents following site-specific planning with public involvement." AR 3F-0619.

## B. The Planned 2016 Gather

Between the 2011 gather and May 2016, the population of adult horses in the Three Fingers HMA grew to approximately 156. AR 3F-1595. Land within and adjacent to the HMA also experienced extended droughts. Some areas adjacent to the HMA experienced severe wildfires in 2013 and 2015, from which they were still recovering in May 2016. According to BLM, although those fires did not reach land within the Three Fingers HMA, the combination of drought and excess horses in the HMA forced horses to move outside of the HMA, and horse grazing outside the HMA impaired fire rehabilitation efforts in those areas. BLM concluded that this combination of factors was jeopardizing the health of the rangelands, wetlands, wildlife habitats, and wild horses. AR 3F-1595.

In June 2016, the BLM Vale District Office proposed, and decided, to gather approximately 100 horses within the Three Fingers HMA, remove 50 of those horses permanently, and return 50 of the horses after treating the mares (female horses) with Porcine Zona Pellucida ("PZP-22"), a contraceptive. AR 3F-1595, 3F-1625. In conjunction with this proposed action and decision, BLM released a Determination of Land Use Plan Conformance and NEPA Adequacy ("June 2016 DNA"), AR 3F-1595-1605, and a corresponding Decision Record, AR 3F-1623-29. BLM concluded that the removal of excess horses was necessary to prevent further damage to natural resources. AR 3F-1596.

BLM concluded that the gather conformed with two applicable Land Use Plans: the SEORMP and the Oregon Greater Sage-Grouse Proposed Resource Management Plan ("Sage-Grouse Plan"). AR 3F-1598. According to BLM, the proposed gather would aid efforts to attain the goals of these two Land Use Plans. BLM also concluded that two NEPA documents covered the proposed gather: the 2011 EA, and the Vale District Normal Fire Year Emergency Stabilization and Rehabilitation Plan and Environmental Assessment ("Vale District Fire Plan"). AR 3F-1598-99.

BLM concluded that the proposed action was "essentially the same as that described in the [2011 EA]." AR 3F-1599. The difference between the action proposed and analyzed in the 2011 EA and the 2016 gather was that in the proposed 2016 gather, only a part, rather than all, of the excess horses would be removed. As such, BLM explained, the 2016 gather would have less of an environmental impact than the action chosen after the 2011 EA. AR 3F-1599. BLM therefore concluded "that the proposed action ha[d] been adequately analyzed in the [2011 EA]." AR 3F-1624. BLM further reported that it had reviewed monitoring data, modeling outputs, recent research, and new management guidance, and had concluded that these new

analyses supported the existing analyses and conclusions in the 2011 EA. Thus, BLM concluded, no new information or change in circumstance required the preparation of a new or supplemental NEPA document. AR 3F-1600.

The roundup was scheduled to begin on August 23, 2016. AR 3F-1705. On June 28, BLM conducted an aerial population inventory of the Three Fingers HMA. BLM counted 202 adult horses and 44 foals—higher than BLM's original estimate. AR 3F-1630-35.[2] On August 17, 2016, FOA filed a complaint (ECF 1) challenging the June 2016 gather Decision Record and DNA and seeking, among other things, an injunction preventing BLM from carrying out the planned gather.

## C. The Cherry Road Fire and Subsequent Actions Taken by BLM

On August 21, two days before the scheduled roundup and while Plaintiff's motion was still pending before the Court, a wildfire broke out in the Three Fingers HMA. AR 3F-1642. On August 23, while the fire was still burning, BLM responded by withdrawing its June 2016 decision. AR 3F-1706. The Cherry Road fire burned approximately 14,893 acres of the Wildhorse Basin Pasture. This constitutes 87 percent of the pasture, or about 24 percent of the entire Three Fingers HMA. AR 3F-1678.

On August 28, BLM decided to conduct an emergency gather of horses in the Three Fingers HMA ("Emergency Gather"), issuing an Emergency Wild Horse Fire Gather Decision Record ("Emergency Gather Decision"). According to BLM, the Wildhorse Basin Pasture, of which approximately 90 percent was burned, represented approximately 50 percent of the range utilized by while horses in the HMA. AR 3F-1642. Portions of the pasture that were unburned

[2] BLM calculated this number by multiplying the number of horses actually observed in the aerial count by 1.08. According to BLM, this is how BLM has, for decades, accounted for horses not seen in an aerial count and calculated the total number of horses in the Three Fingers HMA.

had "limited perennial water sources with any adjacent available forage." AR 3F-1642. The

Emergency Gather Decision estimated the population of horses in the Three Fingers HMA to

be 202 adult wild horses and 77 foals. AR 3F-1642. According to BLM, over half of that

population resided in the northern 25 percent of the HMA, within the Wildhorse Basin Pasture.

BLM noted that the Riverside Pasture was of limited use to the horses. According to BLM, wild

horses did not reside in the middle 25 percent of the HMA due to a lack of water and steep,

rugged terrain. AR 3F-1642. Wild horses no longer resided in the eastern 25 percent of the

HMA. *Id.* The horses not residing in the Wildhorse Basin Pasture generally resided in the

southern 25 percent of the HMA, on limited upland water sources and a few canyons that

provided access to the Owyhee Reservoir. AR 3F-1642. In short, the Cherry Road fire removed

available forage within 90 percent of the Wildhorse Basin Pasture, which itself constituted a

large percentage of the range utilized by wild horses within the Three Fingers HMA.

BLM planned to move 150 horses to another location and prepare them for adoption.

AR 3F-1642-43. Ron Dunton, Acting Director for Oregon and Washington, wrote to the Chief of

the Wild Horse and Burro Division on August 26 requesting approval for the Emergency Gather.

AR 3F-1676. The request noted that the Vale District previously had secured approval to

gather 50 horses from the area burned in the Cherry Road fire, and that "the same issues

addressed in the previous gather approval [were] still present and further amplified as a result of"

the Cherry Road fire. AR 3F-1678.

According to BLM's estimates, the Emergency Gather would leave between 80 and 120

horses in the Riverside Pasture, on the southern end of the HMA. AR 3F-1642-43. This would

result in a population at the low range of the AML for the Three Fingers HMA. BLM predicted

that, most likely, none of the removed horses would need to be returned to the burned areas after

the terrain recovered (which, BLM noted, takes about two active growing seasons), because the population of horses within the Three Fingers HMA was predicted to be over 100 by 2018. AR 3F-1643, 1678. BLM also concluded that "[a]ctions regarding impacts to gathering and returning horses will be the same as analyzed in the [2011 EA]." AR 3F-1643. According to BLM, both Dunton and BLM's Washington, D.C. office approved the gather request. AR 3F-1673, 1676. BLM posted the Emergency Gather Decision on August 29. AR 3F-1707.

**D. Procedural Background**

After BLM withdrew the June 2016 Decision Record, Plaintiff withdrew its pending motion for a preliminary injunction or temporary restraining order (ECF 20) and the Court denied the motion as moot (ECF 21). On September 1, Plaintiff filed a First Amended Complaint challenging the Emergency Gather. ECF 22. On May 8, 2017, Plaintiff filed a Second Amended Complaint ("Complaint"). ECF 35. Plaintiff asks the Court to: (1) declare that BLM's Emergency Gather Decision violated the Free-Roaming Wild Horses and Burros Act and the Administrative Procedure Act; (2) declare that BLM's Emergency Gather Decision violated NEPA; (3) enjoin any action authorized by the Emergency Gather Decision, and require that BLM return any horses removed from the HMA; (4) vacate and remand the Emergency Gather Decision back to BLM; and (5) award Plaintiff costs and attorney's fees.

**DISCUSSION**

FOA argues that BLM's decision to remove all of the wild horses in the Wildhorse Basin Pasture, without plans to return any horses, violated NEPA and WHBA. FOA asks the Court to vacate and remand BLM's Emergency Gather Decision. BLM argues that the Emergency Gather Decision complied with both NEPA and WHBA. BLM also moves to strike exhibits filed by FOA with its motion for summary judgment that are not a part of the administrative record, and to defer briefing on remedies until after the Court rules on the merits of FOA's claim.

## A. National Environmental Policy Act

FOA argues that even if BLM properly removed horses in response to an emergency—the Cherry Road fire—BLM was required to, and did not, comply with NEPA in the process. FOA argues that BLM was required to at least consult with the appropriate office to craft alternative arrangements for NEPA compliance. FOA also argues that BLM was obligated, under NEPA, to subsequently consider alternatives to permanent removal.

### 1. Background on NEPA Emergency Regulations

FOA argues that BLM failed to follow regulations governing emergency situations contained in NEPA and in BLM's own handbooks. NEPA regulation 43 C.F.R. § 46.150 applies when a "Responsible Official" at an agency "determines that an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis and documentation." When necessary to respond to an emergency, a "Responsible Official" may, "before preparing a NEPA analysis and documentation," "take those actions necessary to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources." 43 C.F.R. § 46.150(a).

When an agency proposes actions in response to an emergency that go *beyond* those necessary to control the emergency's immediate impacts, but that "are not likely to have significant environmental impacts, the Responsible Official shall document that determination in an [EA] and a [FONSI]," unless the proposed decision is categorically excluded under 43 C.F.R. § 46.205.[3] 43 C.F.R. § 46.150(c). If, however,

> [T]he Responsible Official finds that the nature and scope of the subsequent actions related to the emergency require taking such

---

[3] BLM does not argue, and the Court does not believe, that the Emergency Gather was categorically exempt. *See* 43 C.F.R. § 46.205 (stating that actions listed in § 46.210 are categorically excluded); 43 C.F.R. § 46.210 (listing Departmental categorical exclusions).

> proposed actions *prior to completing an environmental assessment and a finding of no significant impact*, the Responsible Official shall consult with the Office of Environmental Policy and Compliance about *alternative arrangements for NEPA compliance*. The Assistant Secretary, Policy Management and Budget or his/her designee may grant an alternative arrangement. Any alternative arrangement must be documented. Consultation with the Department must be coordinated through the appropriate bureau headquarters.

43 C.F.R. § 46.150(c) (emphasis added).

If the Responsible Official determines that the proposed actions, beyond those that are immediately necessary, *are* likely to have significant environmental impacts, BLM is required to "consult with CEQ about alternative arrangements as soon as possible." 43 C.F.R. § 46.150(d) (emphasis added); *see also* CEQ regulation 40 C.F.R. § 1506.11 ("Where emergency circumstances make it necessary to take an action with significant environmental impact without observing [NEPA's regulations], the Federal agency taking the action should consult with [CEQ] about alternative arrangements."). The Responsible Official "shall consult with appropriate bureau headquarters and the Department, about alternative arrangements as soon as the Responsible Official determines that the proposed action is likely to have a significant environmental effect." 43 C.F.R. § 46.150(d). These "alternative arrangements will apply only to the proposed actions necessary to control the immediate impacts of the emergency. Other proposed actions remain subject to NEPA analysis and documentation." *Id*.; *see also* 40 C.F.R. § 1506.11 ("Other actions remain subject to NEPA review.").

## 2. The Scope of BLM's Response to the Cherry Road Fire

When a Responsible Official takes only "those actions necessary to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources," NEPA regulations require only that the Responsible Official "take into account the probable environmental consequences of these

actions and mitigate foreseeable adverse environmental effects to the extent practical," and that the Official "document in writing the determination that an emergency exists and describe the responsive action(s) taken." 43 C.F.R. § 46.150(a)-(b). When an agency proposes actions—still in response to an emergency—that go beyond actions necessary to control the emergency's *immediate impacts* which are *urgently* needed to mitigate harm, NEPA regulations require more of agencies. 43 C.F.R. § 46.150(c). Thus, a preliminary issue to resolve is whether BLM's Emergency Gather falls under part (a) or part (c) of § 46.150—that is, whether BLM's actions went beyond what were immediately necessary to control the impacts of the Cherry Road Fire.

FOA argues that BLM's actions went beyond those necessary to control the immediate impacts of the fire, and thus are subject to § 46.150(c). The Emergency Gather Decision stated BLM's rationale as the following:

> The BLM has determined that the emergency removal of a portion of the Three Fingers wild horse herd is needed to ensure survival of the wild horses through the remainder of the summer and upcoming winter, and to ensure the recovery of the rangelands and habitat in the Wildhorse Basin Pasture. The Cherry Road wildfire has created a lack of forage and limited access to unburned forage with adjacent water sources. Both congregation on existing limited water sources adjacent to the unburned portions of the HMA and traveling great distances from unburned forage and water sources will begin to negatively affect wild horse health.
>
> The Cherry Road wildfire burned the entire wild horse preferred habitat in the Wildhorse Basin Pasture. Protection of this preferred habitat is essential as a result to allow adequate recovery of the rangelands and to meet objectives for the management of the HMA. Processes to remove livestock until recovery objectives are met will occur through a separate process, but will be required to allow rangeland recovery.

AR 3F-1643.

On its face, BLM's decision goes beyond what is necessary to control the immediate impacts of the Cherry Road Fire. Its stated rationale for conducting the gather was not just to

control the immediate effects of the fire, but to ensure survival of the horses over the next two seasons, and aid in the habitat's recovery. As BLM explicitly stated, the combination of issues in the HMA was going to "*begin* to negatively affect wild horse health." Thus, BLM's actions, in response to the Cherry Road Fire, went beyond those that were necessary to control the immediate impacts of the emergency and urgently needed to mitigate harm to life, property, or resources.[4]

### 3.   Whether BLM Sought Alternative Arrangements for NEPA Compliance

FOA argues that BLM did not comply with NEPA and that, to the extent the Cherry Road Fire necessitated action taken without NEPA compliance, BLM was required to either: (1) consult with the Office of Environmental Policy and Compliance ("OEPC") about alternative arrangements for NEPA compliance as prescribed by 46 C.F.R. § 4615.0(c); or (2) consult with the Council on Environmental Quality ("CEQ") to establish and document alternative arrangements for NEPA compliance pursuant to 40 C.F.R. § 1506.11. FOA asserts that BLM did not consult with either CEQ or OEPC about alternative arrangements for NEPA compliance. BLM does not argue that it did.

BLM responds that the regulations relating to "alternative arrangements" for NEPA compliance only apply when two things are true: (1) the proposed action would have significant environmental impacts; and (2) legally adequate NEPA analysis has not been performed. ECF 55 at 27; ECF 57 at 4. There are two flaws in this argument.

First, although it is true that CEQ regulation 40 C.F.R. § 1506.11 applies only to actions with significant environmental impact taken without observing NEPA, 43 C.F.R. § 46.150, a

---

[4] The Court also notes that, even if the Emergency Gather fell under § 46.150(a), BLM has not argued, or established, that it both "[took] into account the probable environmental consequences of these actions and mitigate[d] foreseeable adverse environmental effects to the extent practical."

NEPA regulation, is not so limited. Second, BLM quotes a portion of § 46.150 that requires alternative arrangements for NEPA compliance only when actions taken in response to an emergency are not likely to have significant environmental impacts. BLM, however, fails to include a key portion of that very same sentence, which specifies that, when that is the case, "the Responsible Official shall document that determination in an [EA] and a [FONSI]." 43 C.F.R. § 46.150(c). BLM does not identify any EA or FONSI prepared for the Emergency Gather. To the extent BLM means to argue that a previous EA or FONSI supported the Emergency Gather Decision, and qualified as a documented finding for purposes of § 46.150(c), that argument is addressed, and ultimately dismissed, below.

As § 46.150(c) makes clear, in cases when a proposed action is not likely to have significant environmental impacts, and it is determined that the emergency requires that action be taken prior to the completion of an EA and FONSI, BLM is required to consult OEPC about alternative arrangements for NEPA compliance. Because BLM does not assert that it made or consulted on such alternative arrangements, BLM must demonstrate that the Emergency Gather Decision complied with NEPA.

**4.   Whether the Emergency Gather Decision Complied with NEPA**

BLM argues that the Emergency Gather Decision complied with NEPA because it was adequately based on the 2011 EA, the June 2016 Gather Decision, and three other "NEPA analyses": (1) the SEORMP; (2) the Sage-Grouse Plan; and (3) the Vale District Fire Plan. The SEORMP sets the AML for the Three Fingers HMA and guides the HMA's management with the goal of ensuring ecological balance. The Sage-Grouse Plan examined the effects of the wild horse population on sage grouse habitat, and confirmed that the horse population within HMAs should be kept within the AML to protect that habitat. The Vale District Fire Plan serves to

"streamline" emergency stabilization and rehabilitation procedures.[5] FOA argues that the

Emergency Gather Decision did not actually rely on most of these earlier NEPA analyses, as it

mentioned only the 2011 EA, and that even to the extent it did rely on earlier NEPA analyses,

those prior NEPA analyses were inadequate to support the Emergency Gather Decision.

### a. Background on Determinations of NEPA Adequacy ("DNAs")

BLM argues that it is appropriate for an agency to rely on a decision explaining that prior

NEPA analyses adequately analyze a proposed decision. BLM is correct, and FOA essentially

acknowledges, that agencies may sometimes rely on what is known as a Determination of NEPA

Adequacy ("DNA"). "DNAs are an administrative convenience created by the BLM, and are not

defined in NEPA or its implementing regulations issued by [CEQ]." *S. Utah Wilderness All. v.*

*Norton*, 457 F. Supp. 2d 1253, 1255 (D. Utah 2006), *aff'd in part, appeal dismissed in part sub*

*nom. S. Utah Wilderness All. v. Kempthorne*, 525 F.3d 966 (10th Cir. 2008).

A DNA, according to BLM's NEPA Handbook, "confirms that an action is adequately

analyzed in existing NEPA document(s) and is in conformance with the [applicable] land use

plan." United States Department of Interior, Bureau of Land Management, National

Environmental Policy Act Handbook, H-1790-1 ("NEPA Handbook") at § 5.1. The NEPA

Handbook instructs officials to review existing environmental documents and answer several

questions geared at determining whether prior documents adequately analyze a proposed action.

BLM recommends that the "answers be substantive and detailed and contain specific citations to

the existing EA or EIS." *Id*. at § 5.1.2. The manual also instructs officials to consider whether

---

[5] The parties dispute whether the Vale District Fire Plan expressly requires that rangelands be closed to grazing following a fire for two growing seasons. The Vale District Fire Plan provides that "grazing would be deferred for at least two growing seasons, or until resource objectives are met." AR 3F-0531. Thus, as FOA argues, this could mean that grazing would be deferred for *less* than two growing seasons, if resource objectives were met. This dispute, however, is immaterial to the Court's analysis.

public involvement and interagency review has been sufficient with respect to the proposed

action. *Id.* BLM has a "DNA Worksheet" which, although "not itself a NEPA document,"

"documents the review to determine whether the existing NEPA documents can satisfy the

NEPA requirements for the proposed action." *Id.* at § 5.1.3. BLM recommends that officials

document their review in a DNA Worksheet when relying on existing environmental analyses to

support a new proposed action. *Id.*

Reliance on existing NEPA documents is encouraged by NEPA regulations. 43 C.F.R.

§ 46.120 provides:

> (a) When available, the Responsible Official should use existing
> NEPA analyses for assessing the impacts of a proposed action and
> any alternatives. Procedures for adoption or incorporation by
> reference of such analyses must be followed where applicable.
>
> (b) If existing NEPA analyses include data and assumptions
> appropriate for the analysis at hand, the Responsible Official
> should use these existing NEPA analyses and/or their underlying
> data and assumptions where feasible.
>
> (c) An existing environmental analysis prepared pursuant to NEPA
> and the Council on Environmental Quality regulations may be used
> in its entirety if the Responsible Official determines, with
> appropriate supporting documentation, that it adequately assesses
> the environmental effects of the proposed action and reasonable
> alternatives. The supporting record must include an evaluation of
> whether new circumstances, new information or changes in the
> action or its impacts not previously analyzed may result in
> significantly different environmental effects.
>
> (d) Responsible Officials should make the best use of existing
> NEPA documents by supplementing, tiering to, incorporating by
> reference, or adopting previous NEPA environmental analyses to
> avoid redundancy and unnecessary paperwork.

43 C.F.R. § 46.120. Notably, this section requires "appropriate supporting documentation" for

the decision to rely on a previous EA. That supporting record "must include an evaluation of"

any new circumstances, information, or impacts not previously analyzed. *Id.*

In some cases, when a proposed action has already been subject to NEPA review, an agency may be required to prepare a supplemental analysis. Under CEQ regulations, such supplements are required when: "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). In *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989), the Supreme Court held that in deciding whether to prepare a supplemental EIS, "an agency should apply a 'rule of reason.'" *Marsh*, 490 U.S. at 373. On the one hand, requiring an agency to supplement an EIS every time new information came to light "would render agency decisionmaking intractable." *Id.* On the other hand, NEPA clearly requires agencies to "take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." *Id.* at 374. An agency's "decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance"—it depends on whether there is a "major federal action" that will significantly affect the human environment. *Id.* In *Marsh*, the plaintiffs argued that the Army Corps of Engineers' decision not to file a supplemental EIS should be set aside because new information undermined conclusions in the original EIS. The Court concluded that this was a dispute of fact requiring "a high level of technical expertise." *Id.* at 376-77. Thus, the Court concluded, it "must defer to the informed discretion of the responsible federal agencies." *Id.* at 377 (quotation marks omitted). In such a case, "as long as the Corps' decision not to supplement the FEISS was not 'arbitrary or capricious,' it should not be set aside." *Id.*

Since *Marsh*, "[c]ourts have upheld the use of non-NEPA procedures for the purpose of determining whether new information or changed circumstances require the preparation of a

supplemental EA or EIS." *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151

(10th Cir. 2004) (quotation marks omitted). The Ninth Circuit has upheld an agency's use of an

internal "reevaluation process" for the purpose of determining whether further NEPA review is

necessary. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154 (9th

Cir. 2008); *see also Price Rd. Neighborhood Ass'n v. United States Dep't of Transp.*, 113

F.3d 1505 (9th Cir. 1997) (approving use of reevaluation process). An "agency is in full

compliance with NEPA and is not required to conduct a supplemental EA" when it, after taking

"the requisite 'hard look' in a reevaluation, determines that the new impacts will not be

significant (or not significantly different from those already considered)." *N. Idaho Cmty. Action

Network v*, 545 F.3d at 1154-55 (9th Cir. 2008) (quoting *Price Rd Neighborhood Ass'n*, 113 F.3d

at 1510). An agency's determination on this matter will be upheld as long as it is not arbitrary or

capricious. *Id*. at 1155.

In *Price Rd. Neighborhood Ass'n*, the Ninth Circuit addressed a claim that the

Department of Transportation violated NEPA by failing to prepare a supplemental EA after it

modified the original design of a proposed interchange. As the court noted, NEPA requires

supplemental documentation only when the environmental impacts of a change are significant or

uncertain. Neither NEPA nor CEQ regulations provide how an agency should go about making

that determination. The agency in *Price Road*, however, developed an environmental

reevaluation procedure, spelled out in agency regulations, to allow the agency to make this

determination. The Ninth Circuit concluded that this was an appropriate procedure for the agency

to use to determine whether a supplemental EA was required for a proposed action. *Price Rd

Neighborhood Ass'n*, 113 F.3d at 1507. As the court explained, the procedure allowed the agency

to take the requisite "'hard look' at the environmental impacts of project changes." *Id*. at 1510.

After the agency concluded that there were "no discernible differences in the level of environmental impacts" between the original and modified plans, it "was in full compliance with NEPA and was not required to conduct a supplemental EA." *Id.* at 1510.

Thus, the Ninth Circuit has affirmed that the important question is whether the agency has taken a "hard look" at the environmental impacts of a proposed action. Agencies may develop their own procedures to govern that process. *See N. Idaho Cmty. Action Network*, 545 F.3d at 1157 ("Here the agencies prepared both an EA and a reevaluation. In these documents, the Agencies considered the changes to the Project and the impacts of those changes. Although the changes would have somewhat different impacts from those previously analyzed in the 1999 EIS, the Agencies determined that those impacts were not significant or adverse enough to require a SEIS."); *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 565-66 (9th Cir. 2000) (Courts . . . have recognized a limited role within NEPA's procedural framework for [Supplemental Information Reports ("SIRs")] and similar 'non-NEPA' environmental evaluation procedures. . . . We have permitted agencies to use SIRs for this purpose, in part, because NEPA and the CEQ regulations are silent on the issue of how agencies are to determine the significance of new information."); *W. Watersheds Project v. Salazar*, 2011 WL 13124018, at *14 (C.D. Cal. Aug. 10, 2011) ("BLM adequately considered new information regarding higher-than-expected tortoise populations on the ISEGS site. After considering this new information, BLM reasonably chose not to issue a supplemental EIS. Thus, its decision that the FEIS and accompanying mitigation measures adequately dealt with the heightened tortoise population was not arbitrary or capricious. Given the necessary deference to that decision, Plaintiff's claim for a supplemental EIS based on revised tortoise estimates is unlikely to succeed.").

The Court notes, however, that *Marsh*, and the Ninth Circuit cases relying on it, arose in a slightly different context than what the Court is presented with here. In previous cases, a NEPA analysis was prepared for a proposed action, and then some part of the action or some circumstance changed, and the question was whether the agency had to conduct a new NEPA analysis. The question here is whether BLM may use a DNA to rely on NEPA analyses that were done for a *different* proposed action than that which BLM wishes to rely on them for. Neither side has provided argument or case law on this distinction, or on whether it carries any significance. Several district courts have applied similar principles to those articulated in *Marsh* and subsequent Ninth Circuit cases in contexts more closely analogous to what BLM did here.[6] *See Friends of Animals v. U.S. Bureau of Land Mgmt.*, 232 F. Supp. 3d 53, 57 (D.D.C. 2017) (describing the DNA process as laid out in BLM's removal manual, in context of a challenge to proposed BLM gather); *W. Energy All. v. Salazar*, 2011 WL 3738240, at *2 (D. Wyo. Aug. 12, 2011) ("The BLM NEPA process includes developing alternatives to proposed projects, which are analyzed for their environmental and cultural impacts. . . . In some cases, BLM relies on existing NEPA analyses and uses a process called determination of NEPA adequacy (DNA) to document the rationale for concluding that there will be no new significant environmental impact that would require preparation of additional analysis."). In *Friends of Animals v. Haugrud*, 236 F. Supp. 3d 131 (D.D.C. 2017), the court explained that when BLM contemplates a horse gather, it must examine the expected environmental effects, and that "[t]hat examination can take on numerous forms." *Id.* at 132. "[I]f the bureau determines that a proposed gather is

---

[6] BLM does not argue that the Emergency Gather was essentially the same "decision" or "action" as the June 2016 Gather Decision, which was set to begin shortly after the Cherry Road Fire broke out. If it did, BLM would still have to show that it took a "hard look" at whether the changed circumstances—*i.e.*, the fire—substantially changed the impacts as analyzed in the 2011 EA and June 2016 Gather Decision.

similar to a previous gather, BLM officials may prepare a [DNA], confirming 'that an action is adequately analyzed in existing NEPA document(s).'" *Id.* at 133 (citing NEPA Handbook at § 5.1). To do so, the court explained, "officials must complete an accompanying worksheet, answering a list of questions, such as: whether 'the geographic and resource conditions are sufficiently similar to those analyzed in the existing NEPA documents,' and whether 'the existing analysis [is] valid in light of any new information or circumstances.'" *Id.* at 133 (quoting NEPA Handbook at § 5.1.2) (alteration in original).

The Court concludes that a DNA, or a similar process by which BLM takes the requisite "hard look" at the proposed gather, is a proper method of complying with NEPA. BLM is required to provide "appropriate supporting documentation" for its decision to rely on earlier NEPA analyses, including an evaluation of any new circumstances, information, or impacts not previously analyzed.

### b. Whether BLM Took a "Hard Look" at the Proposed Gather

BLM argues, and the Court agrees, that agencies may appropriately rely on DNAs to determine whether existing NEPA analyses sufficiently address the environmental consequences of a proposed action. BLM then argues that given the extensive NEPA analyses on which the Emergency Gather relied, Plaintiff's assertion that BLM performed no NEPA analysis is incorrect. BLM's argument, however, misses a step. BLM is not precise about what, exactly, constituted a DNA with respect to the Emergency Gather Decision. Although BLM prepared a DNA for the June 2016 Gather Decision, BLM has cited to no similar document with respect to the Emergency Gather Decision.

The Emergency Gather Decision stated that "[a]ctions regarding impacts to gathering and returning horses will be the same as analyzed in the 2011 [EA]." AR 3F-1643. The Emergency Gather Decision also noted that the gather conformed with the SEORMP and Sage-Grouse Plan.

The Emergency Gather Decision made no other mention of NEPA. The internal Emergency Gather Request, sent from the Acting Director for Oregon and Washington to BLM's Division Chief of the Wild Horse and Burro Division also noted:

> The Vale District had been approved for the removal of 50 horses within the same area burned by the Cherry Road Fire. The rationale for that approval was based on horse utilization on previously burned areas outside of the HMA, and the impacts such use was having on vegetation rehabilitation projects and PHMA in those areas. In addition to the present animal welfare concerns, the same issues addressed in the previous gather approval are still present and further amplified as a result of this fire.

AR 3F-1678.

Neither party cites to any case addressing what is sufficient to be considered as a DNA. BLM's argument seems to be that the Emergency Gather Decision's reference to the 2011 EA, and perhaps the reference to the June 2016 planned gather approval in the internal Emergency Gather Request, constitutes a DNA. The Court, however, is not so confident.

BLM's handbook prescribes a process by which DNAs are created; this process includes answering several questions with detailed and substantive answers and citations to existing EAs or EIS'; considering whether public involvement has been sufficient; and completing a DNA Worksheet that documents the review. *See* NEPA Handbook at § 5.1.2. These steps were not taken here. The Court finds no identifiable "DNA" as it is understood by BLM itself or by courts interpreting BLM's DNA process.

A DNA is simply "an administrative convenience created by the BLM." *S. Utah Wilderness All.*, 457 F. Supp. 2d at 1255. DNAs "are not defined in NEPA or [CEQ regulations]," and the Court finds no case suggesting that a formal DNA is *required*. *Id.* An "agency is in full compliance with NEPA" when it takes the requisite hard look and "determines that the new impacts will not be significant (or not significantly different from those already

considered)." *N. Idaho Cmty. Action Network v*, 545 F.3d at 1154-55 (9th Cir. 2008). Further,

regulations require that when an existing EA is relied upon, there must be "appropriate

supporting documentation" for the determination that it "adequately assesses the environmental

effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120. Here, in the

absence of a formal DNA, BLM must demonstrate, though other means, that it took the requisite

"hard look" at the impacts of the Emergency Gather. *C.f. Oregon Nat. Desert Ass'n v. Bureau of

Land Mgmt.*, 2011 WL 5830435, at *6 (D. Or. Nov. 15, 2011) (concluding that a DNA properly

considered the environmental effects of a proposed project despite the fact that the DNA did not

explicitly recite the regulatory criteria relevant to this analysis). An agency's determination that

no further NEPA documentation is necessary will be upheld unless it is arbitrary or capricious.

In *Friends of Animals v. U.S. Bureau of Land Mgmt.*, BLM proposed a gather to remove

excess horses on an HMA. 232 F. Supp. 3d 53 (D.D.C. 2017). BLM issued a draft DNA that

concluded that EAs from 2008 and 2012 adequately "covered the proposed [2016] gather

because they analyzed the same analysis area as the proposed action and there ha[d] been no

changes to the HMA boundary, HMA AML or use of PZP since the preparation of the previous

EAs." *Id*. at 59 (alterations and quotation marks omitted). BLM determined, in that DNA, that

the potential alternatives to the proposed gather were the same as those considered in previous

EAs. Furthermore, the draft DNA "specifically incorporated by reference the environmental

effects identified and analyzed by the 2012 EA." *Id*. BLM published the draft DNA for public

comment, incorporated those comments into its revision of the DNA, and issued a final DNA

along with the gather Decision Record. *Id.* FOA sued BLM arguing, among other things, that

BLM's gather was improper because it was not grounded in a recognizable NEPA document,

such as an EA, FONSI, or EIS. *Id.* at 60.

The district court, citing 43 C.F.R. § 46.120(c), explained that in order to rely on an existing analysis, BLM's determination need not "carry a NEPA-approved label." *Id.* at 60-61. Instead, "courts have generally upheld an agency's reliance on prior EAs when 'no new information or circumstances ... convey[] a different picture of the affected environment.'" *Id.* (alteration in original) (quoting *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 218 (D.D.C. 2015)) and citing *Friends of Animals v. U.S. Bureau of Land Mgmt.*, 2015 WL 803169, at *4 (D. Utah Feb. 26, 2015)). The court concluded BLM's proposed gather and accompanying DNA "likely check[ed] these boxes." *Id.*

Here, the record does not support BLM's argument that it took a "hard look" at the environmental effects of the Emergency Gather. Similarly, there is little evidence in the record that BLM complied with CEQ regulations requiring appropriate supporting documentation for BLM's determination that prior NEPA analyses sufficiently analyzed the effects of the Emergency Gather. The Emergency Gather Decision mentions the 2011 EA once, briefly. It also notes that the proposed gather conformed with two applicable Land Use Plans. The Emergency Gather Decision does not, however, discuss the effects analyzed in the 2011 EA or other earlier NEPA documents, and it simply states in a conclusory fashion that the effects analyzed in the 2011 EA would be "the same" as those the proposed Emergency Gather would have. The Emergency Gather Decision does not discuss whether there are any new circumstances, information, or effects not previously analyzed since the earlier NEPA documents.

Similarly, BLM's internal Emergency Gather Request states the same issues addressed in the HMA's June 2016 Gather approval were still present and further amplified as a result of the Cherry Road Fire. This conclusory statement, however, is insufficient to allow the Court to conclude that BLM took a "hard look" at the environmental effects of the Emergency Gather,

including by making "an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." 43 C.F.R. § 46.120. BLM has not pointed to any document that purported to analyze the effect of the Cherry Road Fire itself, or the extent to which the removal of 132 adult horses and 31 foals meaningfully differed from the removal of 50, the amount that had previously been approved. Nor, the Court concludes, has BLM established that its conclusion that earlier NEPA analyses adequately supported the Emergency Gather Decision was supported by "appropriate supporting documentation." *See* 43 C.F.R. § 46.120. On this bare record, the Court finds that BLM failed to comply with NEPA. BLM's determination that earlier NEPA analyses adequately supported the Emergency Gather Decision was arbitrary and capricious.[7]

### 5. Whether BLM Followed its Instruction Memorandum on Emergencies

BLM also argues it followed the procedural steps outlined in a BLM instruction memorandum relating to gathers resulting from "escalating problems and emergency situations." AR 3F-0576-78. FOA argues, first, that the memorandum cited by BLM expressly expired on September 30, 2010, and second, that BLM did not, in fact, follow the steps outlined in the memorandum. Because the Court concludes that BLM did not follow NEPA or CEQ requirements in effectuating the Emergency Gather, it is immaterial whether BLM followed this internal memorandum.

---

[7] BLM might argue that it was subject to emergency conditions and acted reasonably in response. But, this is just the sort of situation for which the NEPA and CEQ emergency regulations were made. As discussed above, those regulations require that, absent full NEPA compliance, BLM is obligated to seek out alternative methods of NEPA compliance. BLM does not argue that it did so.

### 6. Whether BLM Adequately Considered Alternatives

FOA also argues that BLM failed to consider alternatives to permanently removing horses from the northern portion of the HMA. Specifically, FOA argues that BLM should have considered returning the wild horses to the HMA after vegetation rehabilitation, relocating horses to other areas of the HMA, fencing burned areas to prevent grazing, and providing temporary food and water.

FOA notes that the Vale District Fire Plan provides that in the event of a fire wild horse relocation or temporary removal might be necessary. AR 3F-0532. It further provides that other things, such as protective fences, cattle guards, temporary watering sites, and salt or mineral blocks, may be used to control wild horse use during post-fire stabilization efforts. AR 3F-0532. It also provides that livestock and wild horse grazing should be deferred for at least two growing seasons, or until resource objectives are met, through the closure of pastures, resting whole allotments, or construction or reconstruction of protective fences. AR 3F-0531. FOA argues that the Emergency Gather Decision did not address either the Vale District Fire Plan or any other site-specific plan. FOA also argues that BLM has not revisited the issue since removing the horses, and cannot provide any reasonable explanation for why the removals must be permanent. BLM argues that it did consider an appropriate range of alternatives.

NEPA requires agencies to explore reasonable alternatives to a proposed action and to briefly discuss the reasons other alternatives were eliminated from detailed consideration. 40 C.F.R. § 1502.14(a). The "purpose and need" of an agency's project determine the appropriate range of such alternatives. 40 CFR § 1502.13. The Ninth Circuit affords agencies "considerable discretion to define the purpose and need of a project." *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998). As the Supreme Court has stated, an agency's analysis of alternatives "cannot be found wanting simply because the agency failed to include every

alternative device and thought conceivable by the mind of man." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). Courts instead decide whether the range was *reasonable*, giving "deference to the agency's expertise and policy-making role." *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).

BLM argues, first, that because it concluded that the Emergency Gather Decision would not result in significant environmental impacts, the emergency regulations did not require the agency to take the additional step of considering a reasonable range of alternatives to removal. As discussed above, to the extent that BLM is arguing that the emergency regulations do not apply because the proposed action would not have a significant environmental impact, that argument misses the mark. Further, BLM seems to be confusing NEPA and CEQ emergency regulations requiring that an agency seek alternative arrangements *for NEPA compliance* with a requirement that the agency analyze alternatives, generally, to a proposed action in response to an emergency. Finally, BLM further argues that it *did* consider a reasonable range of alternatives.

The Court concludes that BLM properly considered alternatives to permanent removal. After the Cherry Road Fire, BLM's Oregon Acting State Director advised BLM's Washington, D.C. office that "[t]he Vale District [wa]s feeding hay as a temporary measure, but this [wa]s not a sustainable option nor is hauling water." AR 3F-1676. Relocating horses to other areas of the HMA was also considered and rejected, BLM argues, due to a concern that relocated horses would return to where they were moved from. The removal request with the June 2016 DNA explained that previous relocation efforts had failed. AR 3F-1662. BLM also concluded that returning removed horses to the HMA after the fire would be unnecessary because the number of horses remaining after the Emergency Gather would be close to AML, and the total population

would soon return to within AML. BLM also argues that, since it would take at least two growing seasons for the land to recover, it would have made little sense for BLM to decide, as of August 2016, whether and when to return horses to the HMA. BLM could not know, then, how long it would take for the land to recover enough to allow grazing. Under the deferential standard of review, the Court concludes that BLM considered a reasonable range of alternatives.

## B. Wild Free-Roaming Horses and Burros Act

FOA further argues that BLM's Emergency Gather Decision violated the Wild Free-Roaming Horses and Burros Act. Specifically, FOA argues that the Emergency Gather Decision, which authorized the removal of approximately 150-160 horses, did not contain the necessary determination that "excess animals" existed in the HMA and required removal. Instead, FOA argues, BLM improperly relied on earlier analyses. FOA also argues that, in concluding removal was necessary in the Three Fingers HMA, BLM violated WHBA by failing to analyze seven factors for making an excess determination that are set out in BLM's Removal Manual. *See* BLM's Removal of Excess Wild Horses and Burros Manual, MS-4720, ("Removal Manual"). FOA argues that BLM should have, and did not, explain this "departure from its policy on excess determinations." FOA further argues that the Emergency Gather Decision violated WHBA because, prior to the gather, BLM did not demonstrate that the AML still applied. FOA contends that, in order to rely on the AML for making an excess determination, BLM had to demonstrate the AML was still valid for the HMA. Finally, FOA argues that BLM does not have the authority to authorize a gather that results in a horse population below the AML lower limit, even for a temporary period of time. *Id*.

### 1. Excess Determination for the Emergency Gather

FOA asserts that the Fire Gather Decision did not contain a determination that horses in the Three Fingers HMA were "excess." WHBA defines "excess" as horses or burros that "must

be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f). BLM's Removal Manual "describes the authorities, objectives and policies that guide the removal of excess wild horses and burros from the public lands." Removal Manual at § 0.01. The Removal Manual lists seven factors to be analyzed as part of the determination process:

> [G]razing utilization and distribution; trend in range ecological condition; actual use; climate (weather) data; current population inventory; wild horses and burros located outside the HMA, or in herd areas (HAs) not designated for their long-term maintenance; and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range.

Removal Manual at § 1.11.

WHBA offers its own set of considerations for approaching an excess determination, which courts have interpreted liberally. BLM may find "that an overpopulation exists" by referring to:

> (i) the current inventory of lands within [its] jurisdiction; (ii) information contained in any land use planning completed pursuant to [the Federal Land Policy and Management Act of 1976]; (iii) information contained in court ordered environmental impact statements as defined in [the Public Rangelands Improvement Act of 1978]; and (iv) such additional information as becomes available to [it] from time to time, including that information developed in the research study mandated by this section, or in the absence of the information contained in (i-iv) above on the basis of all information currently available to [it].

16 U.S.C. § 1333(b)(2); *Am. Horse Prot. Ass'n v. Watt,* 694 F.2d at 1318. In *Watt*, the D.C. Circuit interpreted § 1333(b)(2) to mean that BLM is required to remove horses "immediately" after determining, "*on the basis of whatever information [the agency] has at the time of [its] decision*, that an overpopulation exists." *Id*. (emphasis in original). BLM argues that it made its determination "on the basis of [relevant] information it had at the time of the decision,"

specifically the existence of excess horses and the evidence of range deterioration. It further

argues that it relied on the June 2016 DNA, which analyzed each of the seven factors in the

Removal Manual.

In *In Defense of Animals*, BLM proposed a gather and documented—in an EA—its

finding that the horse population "vastly exceeded" the applicable AMLs, that overpopulation

was causing land and cultural site deterioration, and that there was likely insufficient forage to

sustain the growing herd. 751 F.3d at 1063. The plaintiffs argued that mere observations that the

herd had grown above the AML upper limit, without evidence the range no longer had a TNEB,

did not constitute a proper excess determination. The Ninth Circuit disagreed and upheld BLM's

excess determination, which was based in part on an inventory of the horse population and in

part on observation of range degradation. The Ninth Circuit found:

> Given the undisputed fact that the wild horse and burro populations
> greatly exceeded their respective AMLs at the time of the gather,
> and the carefully-documented concerns about the deterioration of
> riparian areas and cultural sites caused by overpopulation, as well
> as the likelihood of insufficient forage to sustain the growing herd,
> the BLM properly decided action was necessary to restore the
> AMLs.

*Id.* at 1063. The court concluded that even in the absence of finding that there was currently *not* a

TNEB, "BLM may determine removal is necessary to ensure that the current [TNEB] does not

deteriorate in the future." *Id*. The court also explained that "the AML is a vehicle used to move

towards a thriving natural ecological balance, and a trigger by which the BLM is alerted to

address population imbalance." *Id*. at 1063-64 (alterations omitted); *see also In Def. of Animals*

*v. U.S. Dep't of Interior,* 909 F. Supp. 2d 1178, 1191-2 (E.D. Cal. 2012), *aff'd sub nom. In Def.*

*of Animals,* 751 F.3d 1054 (highlighting that WHBA "equates excess animals with AML

levels"); *Wyoming v. U.S. Dep't of Interior*, 839 F.3d 938, 944-5 (10th Cir. 2016)

(overpopulation is a sufficient excess determination to trigger the subsequent obligation to decide

whether to remove the excess horses); *W. Rangeland Conservation Ass'n v. Zinke*, 265 F.

Supp. 3d 1267, 1274 (10th Cir. 2017) ("Where a given wild horse or burro population exceeds its

designated AML, BLM must decide whether to bring the herd back within AML.").

Here, as in *In Defense of Animals*, BLM determined that horses existed in excess of AML

and considered rangeland conditions across the HMA. The AML for the Three Fingers HMA

is 75-150 horses. At the time of the Emergency Gather Decision, BLM estimated a population

of 202 adult wild horses in the HMA. BLM also monitored the Cherry Road Fire and its effects

on the HMA, observing that 90% of the available forage in the Wildhorse Basin Pasture burned

in the fire. Given the location of horses within the HMA—with approximately 50 percent in the

Wildhorse Basin Pasture—and the limited water sources and available forage left within that

area, BLM concluded that the horses' health was in danger, and that a TNEB would be too if all

of the horses remained. BLM's determination that the HMA population exceeded AML, along

with the concerns BLM documented regarding range health, constitutes a valid excess

determination.

BLM further contends that it relied on its analysis in the June 2016 Decision. FOA argues

that it was improper for BLM to rely on this earlier analysis. Because the Court finds BLM made

a proper excess determination, which reasonably relied on information available to BLM at the

time and considered relevant factors such as overpopulation and HMA conditions, it need not

decide whether BLM would alternatively have been able to rely solely on the June 2016 analysis.

FOA also argues that BLM failed to consider the seven factors laid out in BLM's

Removal Manual. FOA characterizes this as a departure from BLM policy for which BLM was

required to provide a reasoned explanation. FOA relies on *Lynch v. Dawson*, 820 F.2d 1014 (9th

Cir. 1987). In *Lynch*, the Secretary of Social Security issued a new directive that disqualified

certain applicants who would have been eligible for benefits under the agency's previous policy as set out in an agency manual. The Ninth Circuit refused to extend deference to the change, noting that "[a] policy that has undergone change commands less deference than one of a longstanding nature." *Lynch*, 820 F.2d at 1021. As the court explained, "an agency that changes its policy is obligated to supply a reasoned analysis for that change," which the Secretary failed to do. *Id.* Finding that the agency's proposed interpretation of the law would "frustrate the policy that Congress sought to implement," the Ninth Circuit refused to defer to the agency's interpretation and, accordingly, its departure from the policy as stated in its manual. *Id.*

*Lynch* did not purport to "bind the Secretary by the Manual." *Id.* at 1020 n. 11. Rather, the court discussed the manual only to the extent that it showed "the Secretary's practical interpretation of the [relevant statute] ha[d] varied." *Id.* Here, although FOA argues that BLM did not precisely follow steps outlined in a BLM manual, FOA has neither alleged nor shown that BLM's "practical interpretation" of its duties under WHBA changed. There is no evidence that BLM's general understanding, procedure, and goals in implementing WHBA have changed.

Furthermore, the Ninth Circuit has held that administrative manuals and handbooks do not carry the "independent force and effect of law." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). Just as BLM's failure closely to follow its own procedures for creating a DNA was not *necessarily* fatal to its decision, BLM is not *required* to follow its Removal Manual to the letter. Administrative manuals and handbooks "merely establish[] guidelines" for agency action. *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996). The important question is whether BLM followed the applicable WHBA regulations and otherwise properly made an excess determination. The Court finds that, in

assessing horse and range health, BLM made an excess determination that complied with WHBA, and that its approach did not require further explanation.

## 2. AML Validity

FOA also contends that the Emergency Gather Decision is flawed because BLM did not show that the AML still applied at the time of the gather or that removal to the AML was necessary. The Three Fingers AML was set by the Southern Malheur Herd Management Plan in 1975. 3F-0605. The AML lower limit is normally set "at a number that allows the population to grow . . . to the upper limit over a 4-5 year period, without any interim gathers." WHBA Handbook at § 4.2.1. The upper limit is "the maximum number of [wild free-roaming horses and burros] which results in a TNEB and avoids a deterioration of the range." *Id*.

FOA provides, and the Court has found, no case law to support FOA's contention that BLM has an obligation to show that the AML "applies" or remains valid in a given HMA before relying on it to determine whether excess horses occupy the HMA. As BLM argues, WHBA does not create a statutory obligation for BLM to recalculate the AML at every gather. *See In Def. of Animals*, 751 F.3d at 1064 n. 13 ("[N]othing in [WHBA] requires the BLM to determine new AMLs based on current conditions every time the BLM decides to take action to restore the already-established AML."). BLM should evaluate an AML, per its own guidelines, if "review of resource monitoring and population inventory data indicates the AML may no longer be appropriate." WHBA Handbook at § 4.2.2.2. Here, there is no reason to believe it was inappropriate to rely on the existing AML. The last gather occurred in 2011, approximately five years before the June 2016 proposed gather, which is within the WHBA Manual's recommendation that AML be established to allow gathers to be spaced four or five years apart.

FOA further suggests that BLM failed to demonstrate why removal to the AML was necessary. As discussed above, however, WHBA defines "excess" as horses or burros that "must

be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f). The Court has concluded that BLM made a proper excess determination; as a part of that determination, BLM concluded that it was necessary to remove horses in order to preserve and maintain the HMA. Once BLM "determines . . . that [1] an overpopulation exists . . . and [2] that action is necessary to remove excess animals," WHBA instructs BLM to "immediately remove excess animals . . . *so as to achieve appropriate management levels*." 16 U.S.C. § 1333(b)(2) (emphasis added). In other words, WHBA instructs BLM to remove excess horses to bring the population within AML; it does not require BLM make yet another finding that removal *to the AML* is necessary.

### 3. Removal Below AML Lower Limit

FOA additionally argues that BLM may not authorize the reduction of the horse population to a number below the AML lower limit, even if that dip is expected to be temporary. BLM responds that its emergency guidelines allow for a population below the AML lower limit, provided that BLM gives a supporting reason in its gather decision. BLM's emergency procedures provide that "[r]emovals below the AML lower limit may be warranted in emergency situations based on limited forage, water or other circumstances." Removal Manual § 2.22. BLM argues that it provided a rationale in the Emergency Gather Decision: "to ensure survival of the wild horses through the remainder of the summer and upcoming winter, and to ensure the recovery of the rangelands and habitat in the Wildhorse Basin Pasture." AR 3F-1643. In light of the fact that the Cherry Road Fire engulfed acres of wild horse forage, constituting 90 percent of the available forage in the Wildhorse Basin Pasture, it was not unreasonable for BLM to effectuate a gather bringing the HMA population below the AML lower limit. *See Am. Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1179 (10th Cir. 2016) ("Generally speaking, BLM does not remove animals below the AML lower limit except in emergency situations or where

there are 'escalating problems' that 'indicate additional animals need to be removed to protect

land health, wildlife habitat and the health of horses and burros remaining on the public land.'")

(alteration omitted); *Colo. Wild Horse*, 130 F. Supp. 3d at 213 ("The benchmark test is thriving

ecological balance," not "any specific numbers of animals.") (citing *Dahl v. Clark*, 600 F.

Supp. 585, 595 (D.Nev.1984)). Here, BLM concluded that even with the emergency removal, the

HMA population would be within AML by 2017. AR 3F-1678. In light of BLM's subject-matter

expertise, the Court declines to second-guess its conclusion that the dip below the AML lower

limit would be temporary. Because emergency procedures allow BLM to reduce horse

population to below AML if it provides a compelling reason, herd reduction to below the AML

lower limit in this case did not violate WHBA.

For the reasons discussed, the Court finds that BLM made an excess determination in the

Emergency Gather Decision. BLM's subsequent determination that removal was necessary

complied with WHBA because BLM determined that horses' lives and the health of the HMA

were in danger. Furthermore, BLM complied with its emergency procedures in authorizing a

removal below the AML lower limit, concluding, based on its expertise, that the population

would return to within AML levels in a short period of time. Accordingly, the Court finds BLM

did not violate WHBA in carrying out the Emergency Gather.

## C.  BLM's Motion to Strike and to Defer Briefing and Argument on Remedies

BLM moves to strike several exhibits attached to FOA's motion for summary judgment

(ECF 50). ECF 53. BLM argues that the exhibits, which fall outside the administrative record,

are improperly before the Court at this time. BLM further requests that the Court defer briefing

and argument on the appropriate remedies, if any violation is found. FOA responds that the

objected-to exhibits are submitted for the Court's consideration only in determining the

appropriate remedies, should the Court find a violation. FOA also argues that bifurcation of the

merits and remedies portions of this case is unnecessary and not appropriate. BLM's motion to strike is granted, and the Court defers its consideration of the appropriate remedy in this case.

## CONCLUSION

Each parties' respective motions for summary judgment are GRANTED IN PART and DENIED IN PART. FOA's motion for summary judgment (ECF 50) is granted with respect to FOA's claim that BLM's Emergency Gather violated NEPA, but denied with respect to FOA's claim that BLM violated WHBA. Conversely, BLM's cross-motion for summary judgment (ECF 55) is denied with respect to FOA's NEPA claims and granted with respect to FOA's WHBA claims. BLM's motion to strike (ECF 53) is GRANTED. Within 14 days of this Opinion and Order, the parties, after conferring, shall propose to the Court a briefing schedule on the remaining issue of remedy.

**IT IS SO ORDERED**.

DATED this 2nd day of April, 2018.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge