# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**FRIENDS OF ANIMALS**,

    Plaintiff,

v.

**BUREAU OF LAND MANAGEMENT**,

    Defendant.

Case No. 2:16-cv-1670-SI

**OPINION AND ORDER**

R. Scott Jerger, FIELD JERGER LLP, 621 SW Morrison Street, Suite 510, Portland, OR 97205; Michael Ray Harris, FRIENDS OF ANIMALS, WESTERN REGION OFFICE, 7500 E. Arapahoe Road, Suite 385, Centennial, CO 80112; Of Attorneys for Plaintiff.

Jeffrey H. Wood, Acting Assistant Attorney General, Lucinda J. Bach, Trial Attorney, UNITED STATES DEPARTMENT OF JUSTICE, ENVIRONMENT & NATURAL RESOURCES DIVISION, NATURAL RESOURCES SECTION, 601 D Street NW, Washington, DC 20004. Of Attorney for Defendant.

**Michael H. Simon, District Judge.**

    Plaintiff Friends of Animals ("FOA") sues the United States Bureau of Land Management ("BLM"), alleging that BLM's actions in gathering and removing horses from the Three Fingers Herd Management Area (the "HMA") in response to an August 2016 wildfire violated the National Environmental Policy Act ("NEPA") and the Wild Free-Roaming Horses and Burros Act ("WHBA"). FOA and BLM cross-moved for summary judgment (ECF 50, 55). In an Opinion and Order dated April 2, 2018 (ECF 60), the Court granted in part and denied in

PAGE 1 – OPINION AND ORDER

part each party's motion for summary judgment. The Court found that BLM's action violated NEPA but not the WHBA. The Court deferred deciding on the proper remedy for BLM's NEPA violation. Before the Court now are the parties' supplemental briefs on the issue of remedy. For the reasons discussed, BLM's Emergency Gather Decision is remanded, but the Court declines to vacate the decision.

## BACKGROUND[1]

### A. Cherry Road Fire and Emergency Gather

On August 21, 2016, a wildfire broke out in the Three Fingers HMA. AR 3F-1642. In response to the fire, BLM conducted an emergency gather of horses in the Three Fingers HMA ("Emergency Gather"), issuing an Emergency Wild Horse Fire Gather Decision Record ("Emergency Gather Decision"). In the Emergency Gather Decision, BLM planned to remove 150 horses from the HMA. AR 3F-1642-43. The Emergency Gather Decision estimated the population of horses in the HMA to be 202 adult wild horses and 77 foals. AR 3F-1642. The Appropriate Management Level (AML) for the Three Fingers HMA—the optimal population range for horses on the HMA—is between 75 and 150 horses. BLM estimated that after the Emergency Gather, between 80 and 120 wild horses would remain on the HMA (albeit in a different pasture, the Riverside Pasture). AR 3F-1643.

The Emergency Gather Decision stated that the Cherry Road Fire "removed forage necessary to maintain wild horse herds in a thriving natural ecological balance" in the Wildhorse Basin Pasture. AR 3F-1642. The rationales for the Emergency Gather were several. BLM determined that the gather was necessary "to ensure survival of the wild horses through the

---

[1] Additional background information is found in the Court's Opinion and Order on the merits (ECF 60); *Friends of Animals v. Bureau of Land Management*, 2018 WL 1612836 (D. Or. Apr. 2, 2018).

PAGE 2 – OPINION AND ORDER

remainder of the summer and upcoming winter, and to ensure the recovery of the rangelands and habitat in the Wildhorse Basin Pasture." AR 3F-1643. A combination of factors caused by the fire, including "a lack of forage and limited access to unburned forage with adjacent water sources," would "begin to negatively affect wild horse health." *Id*. Protecting the Wildhorse Basin Pasture was "essential . . . to allow adequate recovery of the rangelands and to meet objectives for the management of the HMA." *Id*.

**B. Previous Gather Decisions and NEPA Analyses**

In June 2016, before the Cherry Road Fire broke out, BLM had concluded that the removal of excess horses from the HMA was necessary to prevent damage to natural resources ("June 2016 Gather Decision"). AR 3F-1596. BLM decided to gather approximately 100 horses within the Three Fingers HMA, remove 50 of those horses permanently, and return 50 after treating the mares (female horses) with a contraceptive. AR 3F-1595, 3F-1625. BLM concluded that the proposed gather conformed with two applicable Land Use Plans, and with two preexisting NEPA documents: an Environmental Assessment ("EA") from 2011 (the "2011 EA"), and the Vale District Normal Fire Year Emergency Stabilization and Rehabilitation Plan and Environmental Assessment ("Vale District Fire Plan"). AR 3F-1598-99. The 2011 EA analyzed the environmental impact of conducting a gather on the Three Fingers HMA by comparing five alternative courses of action, including taking no action at all. AR 3F-0602. The Vale District Fire Plan streamlines emergency stabilization and rehabilitation procedures for the region.

The June 2016 Gather Decision concluded that the gather proposed was "essentially the same as that described in the [2011 EA]." AR 3F-1599. In fact, BLM concluded, the 2016 Gather would have less of an environmental impact than the action taken after the 2011 EA, because only some, rather than all, of the horses above AML would be removed. AR 3F-1599. BLM

PAGE 3 – OPINION AND ORDER

therefore determined "that the proposed action ha[d] been adequately analyzed in the [2011 EA]." AR 3F-1624. BLM further reported that it had reviewed monitoring data, modeling outputs, recent research, and new management guidance, and had concluded that these new analyses supported the existing analyses and conclusions in the 2011 EA, and that no new information or change in circumstance required the preparation of a new or supplemental NEPA document. AR 3F-1600.

Two days before the June 2016 Gather was scheduled to begin, the Cherry Road Fire broke out, and BLM withdrew the June 2016 Gather Decision. The Emergency Gather Decision stated that "[a]ctions regarding impacts to gathering and returning horses will be the same as analyzed in the [2011 EA]." AR 3F-1643. An internal request for approval of the Emergency Gather noted that the Vale District previously had been approved to gather 50 horses, and that "the same issues addressed in the previous gather approval [were] still present and further amplified as a result of" the Cherry Road fire. AR 3F-1678. The request also noted that the proposed Emergency Gather would leave the horse population still within AML, and predicted that none of the removed horses would need to be returned after the range recovered (which takes about two active growing seasons), because the horse population was projected to be more than 100 by 2018. AR 3F-1643, 1678.

**C. The Court's Decision**

FOA challenged the Emergency Gather Decision, arguing that it failed to comply with NEPA procedural requirements and with the WHBA. On April 2, 2018, the Court agreed with FOA with respect to its NEPA claim. The Court held that the Emergency Gather Decision failed to comply with NEPA because it did not comply with NEPA provisions relating to emergency actions, and the BLM did not either conduct a full NEPA analysis or properly determine that preexisting NEPA documents adequately analyzed the present conditions.

PAGE 4 – OPINION AND ORDER

### D. Post-Fire Developments

The Emergency Gather removed 155 horses, and at least one horse was euthanized due to injuries resulting from the fire. *Compare* ECF 50-1 at 21 (stating that four horses were euthanized); *with* ECF 65-1 ¶ 14 (stating that one horse was euthanized). The Cherry Road Fire removed available forage within 90 percent of the Wildhorse Basin Pasture, which itself constituted a large percentage of the range utilized by wild horses within the HMA. AR 3F-1642.

After the Cherry Road Fire was controlled, BLM crafted a post-fire recovery plan, called the 2016 Cherry Road ESR Plan ("Cherry Road ESR Plan"). ECF 65-1 ¶ 15. BLM asserts, and FOA does not challenge, that in crafting this plan BLM followed NEPA processes. BLM concluded that the actions proposed in the Cherry Road ESR Plan were adequately analyzed in the Vale District Fire Plan, and that no further NEPA analysis was necessary. *Id*.

To stabilize the area burned in the Cherry Road Fire, facilitate healthy vegetation, and prevent noxious weed invasion, the Cherry Road ESR Plan calls for use of an annual invasive grass herbicide, followed by seeding competitive native and non-native plant species. *Id*. ¶ 16. The Cherry Road ESR Plan predicts that this will expedite recovery and rehabilitation, encourage the reestablishment of habitat for wildlife species, and protect soil and water resources. *Id*. Under the plan, BLM can continue to monitor the area for five years to determine when livestock and wild horse grazing may resume. *Id*. ¶ 17. According to BLM, ESR treatments typically are rested from grazing, by both horses and livestock, for one growing season after application of herbicide for annual grass, and for two growing seasons following a seeding. *Id*. This timeline, however, may be adjusted as needed. *Id*. Fire effectiveness monitoring was scheduled to occur this past June. *Id*. ¶ 16.

BLM has closed the Wildhorse Basin Pasture to permitted livestock grazing until at least March 2019. *Id*. ¶ 18. As monitoring data has yet to be collected and analyzed, BLM does not

consider the Wildhorse Basin Pasture to be fully recovered from the Cherry Road Fire. *Id*. In BLM's opinion, although grazing by the handful of horses that have returned to the Wildhorse Basin Pasture since the fire "is not expected to negatively impact recovery efforts," returning horses to the area before it is fully recovered would likely destroy recovery efforts. *Id*. ¶ 19. This, in turn, risks reducing available wild horse habitat. *Id*. ¶ 21. BLM has also stated that horses are particularly drawn to forage in areas that were recently burned by fire, which could hamper range recovery goals. ECF 50-1 at 11-12. Additionally, as BLM has explained, horses have "high site fidelity," meaning that after being removed they tend to return to their preferred pasture. Fences have proved unsuccessful in preventing this behavior. ECF 50-1 at 17. As such, it would be difficult for BLM to keep horses that were moved back to the HMA from returning to the Wildhorse Basin Pasture.

BLM recently conducted an aerial population survey of the Three Fingers HMA.[2] BLM observed 95 adult horses and 13 foals in the HMA (and one horse outside the HMA). BLM observed 11 horses in the Wildhorse Basin Pasture. Based on this survey, BLM estimates that there are 118 horses currently residing in the HMA.[3]

FOA presents evidence disputing BLM's estimates of the horse population in the HMA, as well as the availability of forage and range conditions. Craig Downer, a wildlife ecologist, states that while visiting the Three Fingers HMA in the summer of 2017, he observed several major areas of the HMA, and conducted a surveillance flight, taking photographs. During the week he was there, he observed only 61 wild horses. Of those, 57 were in one concentrated

---

[2] According to BLM, this is the most accurate method of measuring horse populations.

[3] These numbers are based on representations to the Court by counsel for BLM at the hearing held on August 8, 2018. BLM offered to submit declarations to this effect, but the Court declined the offer because the precise numbers of horses currently on the HMA does not factor into the Court's analysis of the proper remedy.

PAGE 6 – OPINION AND ORDER

group around a water source. ECF 50-2 ¶¶ 7-11. Downer did observe, however, more than one thousand cattle, dispersed throughout the HMA. ECF 50-2 ¶¶ 11-12. Downer states that he observed a great majority of the HMA to have abundant forage and water, suitable for wild horse habitat. Downer also observed "considerable patches of forage remaining in and around" the area burned by the Cherry Road Fire. ECF 50-2 ¶ 17.[4]

## STANDARDS

When a court finds that an administrative agency took an arbitrary and capricious action, "the proper course [is] to remand to the Agency for clarification of its reasons," *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007) (citing *Gonzales v. Thomas*, 547 U.S. 183 (2006)). The reason for this is that when "within broad limits the law entrusts the agency to make" certain decisions, "a judicial judgment cannot be made to do service for an administrative judgment." *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (alteration omitted) (quoting *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002)). A court may not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Ventura*, 537 U.S. at 16. Thus, "[g]enerally speaking, a [court] should remand a case to an agency for decision of a matter that statutes place primarily in agency hands." *Id*.

A secondary question, however, is whether the agency decision should also be vacated, or should instead remain in effect while the agency corrects its error. "A flawed rule need not be vacated." *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012). Rather, "'when equity demands, the regulation can be left in place while the agency follows the necessary procedures' to correct its action." *Id*. (quoting *Idaho Farm Bureau Fed'n*

---

[4] Downer's opinion is that the interest of the wild horses, in the Three Fingers HMA, is being deprioritized in favor of public lands livestock ranchers. ECF 50-2 ¶ 15. This is also the opinion of Nicole Rivard, a member and employee of FOA. *See generally* ECF 50-3.

*v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)). The remedy of "remand without vacatur," as it is known, is ordered only "in limited circumstances." *Id*. at 994.

"Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id*. at 992 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *see also Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015) (describing standards for remand without vacatur). In considering whether to vacate decisions made by the Environmental Protection Agency, for example, the Ninth Circuit considers "whether vacating a faulty rule could result in possible environmental harm," choosing "to leave a rule in place when vacating would risk such harm." *Pollinator*, 806 F.3d at 532. The Ninth Circuit has "also looked at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Id*.

In *Idaho Farm Bureau*, the Ninth Circuit chose not to vacate an agency rule because doing so may have wiped out a species of snail. *California Communities*, 688 F.3d at 992 (discussing *Idaho Farm Bureau*, 58 F.3d at 1405-06). In *Western Oil and Gas*, the court similarly declined to order vacatur because vacatur "would have thwarted 'the operation of the Clean Air Act in the State of California during the time the deliberative process was reenacted.'" *Id*. (quoting *Western Oil and Gas Ass'n v. U.S. E.P.A.*, 633 F.2d 803, 813 (9th Cir. 1980). The Ninth Circuit denied vacatur in *California Communities*, because vacating the agency decision to construct a new power plant would cause electricity blackouts and air pollution, would be "economically disastrous," and would necessitate legislative action. *Id*. at 993-94. On the other

hand, in *Pollinator Stewardship Council*, the Ninth Circuit found that "given the precariousness of bee populations," leaving in place an EPA decision to approve certain insecticides for use "risk[ed] more potential environmental harm than vacating it." 806 F.3d at 532. Furthermore, "on remand, a different result may be reached." *Id*. The court therefore vacated the agency's action and remanded "for the EPA to obtain further studies and data regarding the effects of" the insecticides, as agency regulations required.

## DISCUSSION

The parties agree that, at a minimum, remand is an appropriate remedy for BLM's NEPA violation. Plaintiff asks that the Court also vacate at least two portions of the Emergency Gather Decision: (1) the portion referring to "recovery of the rangelands and habitat" in the burned portions of the HMA; and (2) the portion requiring "permanent" removal of horses from the Wildhorse Basin Pasture. At a hearing held on the issue of remedies, Plaintiff clarified its position as being that the Emergency Gather Decision should be vacated except to the extent it authorized removal of the horses for the purpose of protecting them from the immediate effects of that fire. Plaintiff explains that although it may be proper to keep the removed horses off the HMA until the range is fully recovered, the Emergency Gather Decision itself should be vacated because it failed adequately to analyze whether there would be a significant environmental impact of removing all (or nearly all) of the horses from the Wildhorse Basin Pasture. Plaintiff also urges the Court to "provide guidance to BLM on the appropriate application of NEPA in issuing emergency wild horse management decisions." Balancing the seriousness of BLM's error and the likelihood with which it may be able to justify its action on remand with the disruptive effect of vacatur, the Court concludes that remand without vacatur is the appropriate remedy in this case.

PAGE 9 – OPINION AND ORDER

In finding in favor of FOA, the Court concluded that because of the rationales stated in the Emergency Gather Decision, the decision went beyond what was "necessary to control the *immediate impacts* of the" Cherry Road Fire and was "urgently needed to mitigate harm to life, property, or other resources." 43 C.F.R. § 46.150(a) (emphasis added). As such, BLM was required either to document a finding of no significant environmental impact in an EA or a formal Finding of No Significant Impact ("FONSI"), or to "consult with the Office of Environmental Policy and Compliance ["OEPC"] about alternative arrangements for NEPA compliance." 43 C.F.R. § 46.150(c). In conducting the Emergency Gather, BLM instead relied on earlier NEPA analyses. The Court found that in doing so, BLM failed to establish that it had taken the requisite "hard look" at the environmental impacts of its proposed action. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). On the one hand, BLM's NEPA violation was narrow in the sense that, had BLM merely consulted with OEPC about alternative arrangements for NEPA compliance as required by 43 C.F.R. § 46.150(c), the Emergency Gather may have complied with NEPA.[5] On the other hand, the Court found that BLM failed adequately to examine the environmental impacts of action, flouting the very purpose of NEPA.

The parties dispute the likelihood that BLM will be able to reach the same decision on remand. On the one hand, the June 2016 Gather Decision was approved and a gather was about to be conducted before the Cherry Road Fire broke out. In making that decision, BLM made a Determination of NEPA Adequacy that applicable Land Use Plans and the 2011 EA adequately

---

[5] Alternatively, BLM could have provided a more robust Determination of NEPA Adequacy, documenting its evaluation of any new circumstances, information, or effects not previously analyzed in NEPA documents. *See* 43 C.F.R. § 46.120; *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154-55 (9th Cir. 2008) (explaining that an agency complies with NEPA when it, after taking "the requisite 'hard look' in a reevaluation, determines that the new impacts will not be significant (or not significantly different from those already considered)").

analyzed the proposed gather.[6] One reason for that was that the planned June 2016 Gather involved removing only a portion of horses above AML, whereas the 2011 EA analyzed the effects of removing all horses above AML. In the Emergency Gather Decision, BLM removed all of the horses above AML (if not more). It is not unreasonable to imagine that BLM may now be able to rely on the 2011 EA as adequately analyzing the impact of the Emergency Gather. On the other hand, Plaintiff argues that the Emergency Gather differed from previous gathers because it removed the entire horse population of one pasture—an action which is heretofore unanalyzed in earlier NEPA documents and which may have significant environmental impacts.[7] BLM argues that it is not required to maintain a horse population that is equally dispersed throughout each pasture, but rather on the HMA as a whole. Although this may be true, it does not fully dispose of Plaintiff's argument, which is that the removal of all horses from one pasture, and maintaining the entire HMA horse population on another pasture, may have some environmental impacts that are yet un-analyzed.

Although these first two factors do not point clearly in either direction, the Court concludes that the disruptive impact of vacatur is dispositive. Although the current state of the HMA is somewhat in dispute, that there is sufficient evidence to find a risk of harm to the HMA if the removed horses were to be returned at this time. The evidence suggests that this could negatively affect the range's future ability to provide a viable habitat for wild horses, and would

---

[6] Although FOA initially filed this suit to challenge the June 2016 Gather Decision, the question of whether that decision itself was proper is not before the Court at this time.

[7] The horses on the Three Fingers HMA have historically been concentrated in two areas of the HMA: the Wildhorse Basin Pasture, and the southern end of the Riverside Pasture. Horses generally did not reside in the Honeycombs area (in the northern end of the Riverside Pasture) due to a lack of water and steep, rugged terrain. ECF 50-1 at 6-7. Horses had previously resided in the eastern portion of the Riverside Pasture, but have not since the mid-2000s, when wildfires resulted in the invasion of nonnative annual grasses. ECF 50-1 at 6.

be inconsistent with applicable Land Use Plans and other land management plans currently in place. Although FOA presents evidence that there is available forage in the HMA, it does not dispute BLM's characterization of the fire recovery plans, or the need to prevent grazing on the forage that is available during fire recovery efforts. FOA, in fact, does not appear wholly to dispute the claim that it would be unwise to return the removed horses to the HMA at this time.

FOA urges the Court at least to vacate *portions* of the Emergency Gather Decision. First, FOA asks that the Court vacate the portion of the decision referring to future "recovery of the rangelands and habitat." The action on review, however, is the Emergency Gather Decision and corresponding roundup and removal of horses from the HMA. Although the Court found this portion of the decision to go beyond what was necessary to control the immediate impacts of the fire, and thus this portion, in part, rendered BLM's action arbitrary and capricious, the proper remedy is not simply to remove this mention from the decision. NEPA regulations are designed to ensure that BLM adequately supports its actions. Thus, the proper remedy is to remand, either with or without vacatur, the entire decision on review, and to allow BLM to determine whether it may appropriately justify its action, or to take a different action. Simply vacating this reference in the decision would not correct BLM's error.

FOA also asks the Court to vacate the portion requiring "permanent" removal of horses from the HMA.[8] If the Court vacated only this portion of the decision, however, there would be no clear mandate under the remainder of the decision immediately to return horses to the HMA. Thus, it would still fall on BLM to determine whether returning the horses is appropriate at this

---

[8] Because the Emergency Gather Decision does not explicitly make the removal "permanent," FOA presumably refers to the Emergency Gather Decision's statement that removed horses would "be prepared for inclusion in the adoption program," because a sufficient number of horses would remain on the HMA to maintain AML levels.

time or, if not, when it may be appropriate. It is not for the Court to fill in the gap that would be left if the permanence of BLM's action were to be removed.

FOA argues that the Emergency Gather Decision decision could be vacated except to the extent it called for removal of horses to protect them from the immediate impact of the fire, such as the risk of being injured or killed in the fire. FOA also acknowledges, however, that it may be improper to return horses to the HMA before the rangeland has recovered from the fire. FOA argues that, once recovery efforts reach a point where it would *not* be harmful to return horses to the pasture, BLM must analyze the effect of permanently removing horses from the Wildhorse Basin Pasture, and determine whether horses should be returned. The problem with these arguments, however, is that the Court cannot both vacate the decision except to the extent it called for removal of horses to protect them from the *immediate effects of that fire*, *and* permit BLM to keep horses off the HMA while the range recovers over the next few growing seasons. This latter consideration formed, in part, the basis of the Court's determination (and FOA's arguments) that the Emergency Gather Decision went *beyond* what was necessary to control the fire's immediate impact. Furthermore, it is not clear how the remedy Plaintiff seeks—vacating the Emergency Gather Decision, or portions of it, but permitting the gather itself to remain in place while range conditions are monitored—is much different from simply remanding the matter to BLM without vacating the decision. As discussed above, the decision of whether and when to return horses to the HMA would ultimately fall to BLM under either scenario.

Finally, with respect to FOA's argument that the Court should provide guidance to BLM on how to comply with NEPA, doing so would exceed the Court's proper role. A court may not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency," *Ventura*, 537 U.S. at 16, and "a judicial judgment cannot be made to do service for an

PAGE 13 – OPINION AND ORDER

administrative judgment," *Gonzales*, 547 at 186. The Court's Opinion and Order granting partial summary judgment in favor of Plaintiff itself gives sufficient guidance to BLM, to the extent necessary to decide the issue then before the Court. Any further "guidance" or opinion expressed on the proper way for BLM to comply with NEPA would improperly constitute an advisory opinion.

## CONCLUSION

BLM's Emergency Gather Decision ordering the roundup and gather of horses on the Three Fingers HMA in response to the Cherry Road Fire is remanded to the agency to provide further reasoning and explanation for its decision. The Court, however, declines to vacate the decision on remand.

**IT IS SO ORDERED**.

DATED this 9th day of August, 2018.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge